## PEOPLE v GUY

Docket No. 54359. Submitted March 2, 1982, at Grand Rapids.—
    Decided December 6, 1982. Leave to appeal applied for.

Larry G. Guy was convicted of carrying a concealed weapon,
    Calhoun Circuit Court, Stanley Everett, J. Defendant appeals,
    alleging that the composition of the jury array deprived him of
    a jury containing a representative cross-section of the commu-
    nity, that evidence of the weapon should have been suppressed
    as the fruit of an illegal detention, that a res gestae witness
    was improperly impeached by extrinsic evidence on a collateral
    matter, and that a prosecution witness was erroneously allowed
    to invoke the privilege against self-incrimination. *Held:*

    1. There has been no showing that there was systematic
    exclusion of blacks from the jury array nor that the statutory
    procedures for selecting veniremen were not followed. Defen-
    dant's motion for a remand on this issue is denied.

    2. Defendant had been a passenger in a car which was
    stopped by police who suspected another passenger of being the
    object of a felony warrant. Defendant had been freed from the
    temporary detention when the events transpired which led to

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 47 Am Jur 2d, Jury §§ 163, 164, 173 *et seq.,* 180 *et seq.*

    Group or class discrimination in selection of grand or petit jury as
    prohibited by Federal Constitution—Supreme Court cases. 33 L
    Ed 2d 783.

    Validity of statutory classifications based on population—jury selec-
    tion statutes. 97 ALR3d 434.

    Proof as to exclusion of or discrimination against eligible class or
    race in respect to jury in criminal case. 1 ALR2d 1291.

[3] 68 Am Jur 2d, Searches and Seizures § 102.5.

[4] 29 Am Jur 2d, Evidence § 415.

[5, 6] 81 Am Jur 2d, Witnesses §§ 612, 613.

[6] 81 Am Jur 2d, Witnesses §§ 614-616.

[7] 21A Am Jur 2d, Criminal Law §§ 701, 710.

    81 Am Jur 2d, Witnesses §§ 30, 36, 49, 51, 62, 63.

[8] 81 Am Jur 2d, Witnesses § 36.

[9] 81 Am Jur 2d, Witnesses §§ 471, 472.

[10] 81 Am Jur 2d, Witnesses §§ 40, 49.

[11] 5 Am Jur 2d, Appeal and Error §§ 778, 783.

the officers' discovery of defendant's weapon and his arrest. The evidence regarding the weapon was not tainted by an illegal detention.

3. The matter on which a witness was impeached by extrinsic evidence was not a collateral matter for purposes of the rule prohibiting such impeachment. The trial court did not abuse its discretion in allowing the evidence to be presented.

4. A police witness was allowed to exercise his privilege against self-incrimination regarding certain questions pertaining to his relationship with the defendant. The witness did not waive the privilege by responding to certain of the questions put to him, nor was the limitation of cross-examination resulting from the witness's invocation of the privilege so substantial as to result in prejudice to the defendant. Further, although the manner in which the privilege was invoked was improper, in an in-chambers proceeding prior to the questions being asked of the witness, the error was harmless.

Affirmed.

1. JURY — SELECTION OF JURORS.

A defendant is entitled to a jury which contains a representative cross-section of the community; to establish a prima facie violation of this requirement, a defendant must prove (1) that the group alleged to be excluded is a distinctive group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

2. JURY — SELECTION OF JURORS.

Underrepresentation of a population group in venires from which juries are selected must be inherent in the process used for jury selection in order to constitute prohibited "systematic exclusion" of members of that group from juries.

3. ARREST — STOP TO DETERMINE IDENTITY.

A police officer may, in appropriate circumstances, stop a person to determine that person's identity.

4. CRIMINAL LAW — EVIDENCE — SUPPRESSION OF EVIDENCE.

The test for determining whether evidence should be suppressed as the "fruit of the poisonous tree" is whether, granting the establishment of the primary illegality, the evidence was obtained by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

5. CRIMINAL LAW — WITNESSES — IMPEACHMENT — COLLATERAL
FACTS.

A witness may not be impeached by use of extrinsic evidence on a
collateral matter; facts are not considered to be collateral for
purposes of this rule if they are independently provable.

6. CRIMINAL LAW — WITNESSES — IMPEACHMENT — COLLATERAL
FACTS.

Three kinds of facts are not considered to be collateral for
purposes of impeaching a witness: (1) those directly relevant to
the substantive issues in the case, (2) those showing bias,
interest, conviction of crime and want of capacity or opportu-
nity for knowledge, and (3) any part of the witness's account of
a material transaction which as a matter of human experience
he would not have been mistaken about if his story were true.

7. CRIMINAL LAW — PRIVILEGE AGAINST SELF-INCRIMINATION.

The Fifth Amendment privilege of a defendant on trial is not
only to avoid giving incriminating responses to inquiries put to
him but also to be free from the inquiries themselves, and he
therefore waives the privilege when he subjects himself to
inquiry by voluntarily taking the witness stand; a mere wit-
ness, however, has only the privilege of not giving an incrimi-
nating response to an inquiry; a witness who answers a ques-
tion without invoking the privilege does not waive the right to
invoke the privilege in response to a subsequent question on
the same subject unless the answer to the subsequent question
would be no more incriminating than the response to the
earlier question.

8. CRIMINAL LAW — WITNESSES — PRIVILEGE AGAINST SELF-INCRIMI-
NATION.

The fact that the criminal process is not in progress or not
planned is immaterial to whether a witness may invoke the
Fifth Amendment privilege against self-incrimination.

9. CRIMINAL LAW — WITNESSES — CROSS-EXAMINATION.

A conviction based upon the testimony of a witness cannot be
sustained if cross-examination of the witness has been unrea-
sonably limited.

10. CRIMINAL LAW — WITNESSES — PRIVILEGE AGAINST SELF-INCRIMI-
NATION.

A witness who is not the accused must submit to inquiry and
may invoke the privilege against self-incrimination only after a
potentially incriminating question has been asked.

11. APPEAL — HARMLESS ERROR.
    An error may not be considered harmless if the error was so
    offensive to the maintenance of a sound judicial process that it
    can never be regarded as harmless or, if not so basic, the
    reviewing court cannot declare a belief that the error was
    harmless beyond a reasonable doubt.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Conrad J. Sindt,* Prosecuting Attorney, for the people.

*Philo, Atkinson, Darling, Steinberg, Harper & Edwards* (by *Carl R. Edwards),* for defendant on appeal.

Before: D. F. WALSH, P.J., and CYNAR and W. F. HOOD,* JJ.

W. F. HOOD, J. Defendant was charged with carrying a concealed weapon, MCL 750.227; MSA 28.424. He was convicted of that offense by jury verdict and sentenced to a term of imprisonment of three to five years. He appeals as of right.

The charge grew out of events in the City of Battle Creek in the early morning hours of June 17, 1979. According to the testimony of Battle Creek city police officers, those events were as follows. At about 2:30 a.m. Officer Ronald Hattis, while on duty and in uniform, was sitting in his marked patrol car near a street intersection when he observed a white Lincoln Continental enter the intersection. The officer recognized the car as one owned by Robert Guy, and observed that Robert Guy was the driver. There were two passengers, one in the front seat and the other in the rear seat, but the officer did not recognize either passenger. The officer's interest centered on the vehicle because he knew there was a felony warrant

---

* Circuit judge, sitting on the Court of Appeals by assignment.

outstanding for one Roy Guy who previously had been seen in this particular car.

The Continental turned at the intersection and proceeded up the street. The officer followed in his patrol car because he wanted to get a closer look at the passenger in the rear seat to see if he was Roy Guy or not. For a few blocks the distance between the two cars widened and when the patrol car again got close to the Continental the rear seat passenger was no longer in view, despite the fact that the Continental had not stopped at any time to discharge a passenger. The Continental turned on to Ann Avenue and after proceeding a short distance at a slow rate of speed pulled to the curb and stopped. The officer drove by the Continental and was still unable to see anyone in the back seat. The officer turned around and returned, stopping his patrol car close beside the Continental. At this time he could see a man lying down in the back seat. The officer then moved off to turn around again, intending to stop the Continental to see if the person in the rear seat was Roy Guy. As the officer was in the process of turning his patrol car around, the Continental pulled out from the curb and into the driveway of a nearby house. Hattis stopped the patrol car in such a manner as to partially block the driveway exit. He then walked to the Continental, at which time he observed that defendant, whom he knew, was the front seat passenger.

The rear seat passenger was asked for identification, and he gave the officer a driver's license. As he did so, the officer saw his face for the first time and realized he was not Roy Guy. The license given, however, was that of Robert Guy, whom the officer knew to be the driver, not the rear seat passenger. Backup officers arrived on the scene

and were unable to identify the passenger. Further radio information was received that a warrant had been issued for a Willie Scott Guy. Robert Guy indicated the passenger was Michael Guy. Hattis radioed for an Officer O'Connell who knew the Guy family fairly well to come to the scene. O'Connell came and identified the person in the rear seat as Willie Scott Guy, who was arrested. Robert Guy was also arrested.

The officers told defendant he was free to go. Officer Jeffrey Shouldice, one of the backup officers, observed defendant as he walked from the Continental toward the street and then angled directly toward a patrol car into which an officer was in the process of placing Robert Guy. When Shouldice realized defendant's direction of travel he began to follow defendant, watching him to try to determine what his intentions were. As defendant neared the patrol car, Shouldice observed defendant's right hand move toward the front of his body, out of Shouldice's vision from the rear, and at the same time defendant's left hand began moving in front of his body in such a manner that he appeared to be brushing his coat back away from his waist. Shouldice unholstered his gun, pointed it at defendant, and ordered him to freeze. Officer Hattis approached and was told by Shouldice, "I think he has a gun". Hattis "took ahold" of defendant, and both he and defendant fell to the ground and a struggle began. Several other officers joined in the fray. The struggle ended after defendant was struck on the head with a pair of karate sticks which had been found in the Continental. A loaded pistol was removed from the left side of defendant's waist by officers Hattis and O'Connell.

Just prior to trial, defense counsel moved to quash and dismiss the case for failure of the state

to provide a fair cross-section of the county population from which to select the jury. At a hearing on the motion, four maps of the greater Battle Creek area were placed in evidence showing the location of the residence, according to jury questionnaires, of 98% of the jurors on the four panels summoned for defendant's trial that was about to begin and for a previous trial date that had been postponed. The exhibits disclosed only four persons from a northeast Battle Creek community which was an area, the court judicially noticed, with a heavy concentration of black population. The court found that such area was underrepresented on the jury panels when considering the proportion of the total county population living in such area.

Testimony was taken from the jury board clerk concerning the procedure used to select the panels. This testimony disclosed that the procedure mandated by statute was closely followed. The jury board clerk opined that underrepresentation on the panels of people from the area might be due to a lesser proportion registering to vote, and also that the people in the area may have been more mobile, making it difficult to contact them by mail. The jury clerk further testitifed that race or color was not a subject of inquiry on the questionnaires sent out by the board. The trial court found that the statutory procedure was not responsible for systematic underrepresentation of the area in question and denied defendant's motion to dismiss.

A number of issues have been raised in this appeal pertaining to pretrial rulings as well as to matters occurring at trial. Further facts will be noted in discussing the issues raised.

I. *Should the cause be remanded to the trial court for a further hearing to determine whether the composition of the jury array was a result of systematic exclusion of blacks?*

Defendant is entitled to a jury which contains a representative cross-section of the community. *Taylor v Louisiana,* 419 US 522; 95 S Ct 692; 42 L Ed 690 (1975). In order to establish a prima facie violation of the fair cross-section requirement, defendant must prove: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process." *Duren v Missouri,* 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979).

The first requirement is obviously met, and the trial court's finding of underrepresentation of the Battle Creek area on the panels, coupled with the trial court's taking judicial notice that such area contained a heavy concentration of black population, would appear to satisfy the second requirement. The trial court found that the underrepresentation of blacks on the panels was not due to systematic exclusion in the jury selection process; and thus the third requirement is not met. Defendant contends, however, that the question arose so close to trial that he did not have sufficient time to develop and present proofs to satisfy the third requirement. He seeks a remand to the trial court to provide opportunity to present such proofs. We decline the request for remand because it would be fruitless.

Defendant concedes that the testimony in the trial court hearing on his motion disclosed that the procedure prescribed by statute[1] for jury selection was closely followed. Defendant does not seek

---

[1] MCL 600.1301 *et seq.;* MSA 27A.1301 *et seq.*

to introduce evidence to the contrary. Instead, defendant seeks an opportunity to provide evidence that the statutory procedure itself systematically discriminates against blacks.

To constitute "systematic exclusion," underrepresentation of the distinctive group would have to be "inherent" to the process utilized. *Duren v Missouri, supra,* p 366. A dictionary definition of "inherent" is "existing in something as a natural, inseparable quality or characteristic; * * * basic * * *". We are unable to perceive of any kind of evidence which would establish discrimination on the ground of race or color to be an inseparable, basic characteristic of a procedure involving random selection of veniremen from registered voters lists, when race or color is not the subject of inquiry during the process.

An in-depth statistical study likely would reveal that the proportion of people registering to vote varied significantly in groups categorized according to age, or marital status, or religious, ethnic, racial affiliation or origin, geographic area, or sex. Since none of those factors are considered in the course of the jury selection process, there is no systematic exclusion of any such group. Persons who do not register to vote are systematically excluded, but a group of persons who fail to register to vote is not considered a cognizable "distinctive" group within a community as required for the *Duren* test. See *People v Robinson,* 41 Mich App 259; 199 NW2d 878 (1972); *People v Gray,* 45 Mich App 643; 207 NW2d 161 (1973), *aff'd* 393 Mich 1; 222 NW2d 515 (1974); *People v Bell Williams,* 50 Mich App 763; 213 NW2d 754 (1973), *lv den* 394 Mich 794 (1975); *People v Sanders,* 58 Mich App 512; 228 NW2d 439 (1975), *lv den* 397 Mich 851 (1976).

Defendant's motion for remand is, therefore, denied.

II. *Should evidence of the weapon have been suppressed as the fruit of an illegal detention?*

Prior to trial defendant moved to suppress evidence of the weapon and to quash the information on the ground that the initial detention of the automobile in which defendant was a passenger was a violation of defendant's Fourth Amendment rights and the discovery of the weapon was the inadmissible fruit of such violation. The trial court denied the motion and defendant claims error.

Although the initial stop of the Continental in the driveway was not the result of Officer Hattis's actions, his partial blockage of the driveway and subsequent visit to the Continental clearly constituted a detention of the automobile and would be the equivalent of a police-initiated "stop".

A police officer may stop a person to determine that person's identity. *People v Grimmett,* 97 Mich App 212, 215; 293 NW2d 768 (1980), *lv den* 411 Mich 853 (1981). Under the circumstances, it was impossible to stop only Willie Scott Guy (whom the officer was attempting to identify) without also stopping defendant and the driver of the automobile. Officer Hattis knew that Roy Guy was the driver's brother and was frequently seen in the Continental. He further knew that a felony warrant had been issued for Roy Guy.[2] He could not identify the person from the road. This person had also attempted to hide in the back seat. This was sufficient to give Officer Hattis a reasonable suspicion that the back-seat passenger was Roy Guy, whom the officer was under a legal duty to arrest. Thus a stop to determine the identity of the passenger was appropriate.

Subsequently, the officer learned that there was also a warrant for Willie Scott Guy. He had been

[2] The warrant was for assault with intent to murder.

given a driver's license by the rear seat passenger which identified him as Robert Guy, but the officer knew that Robert Guy was the driver, not the rear seat passenger. Accordingly, further detention was proper since the officer had a reaonsable suspicion. *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968); *People v Carter,* 96 Mich App 694; 293 NW2d 681 (1980), *lv den* 410 Mich 872 (1980); *People v Bloyd,* 96 Mich App 264; 292 NW2d 546 (1980), *lv gtd* 409 Mich 897 (1980); *People v Grimmett, supra.*

Even assuming defendant's detention was illegal and that without such detention the events that led to discovery of the weapon would not have occurred, suppression of the evidence was not required. In determining whether evidence should be suppressed as the "fruit of the poisonous tree", the test is not whether such evidence would not have come to light but for the illegal action of the police. As stated in *Wong Sun v United States,* 371 US 471, 488; 83 S Ct 407; 9 L Ed 2d 441 (1963):

"'* * * [T]he more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

Since defendant had been freed from detention at the time of the events which led to the discovery of the weapon, the evidence was not "come at" by exploitation of the detention. Defendant's motion to quash and suppress the evidence was, therefore, properly denied.

III. *Was the prosecution erroneously allowed to impeach Robert Guy by extrinsic evidence of a collateral matter?*

The prosecution called Robert Guy as a res gestae witness. He testified in detail as to the events which preceded the struggle between the officers and defendant, including the activities of the occupants of his car and of the police officers from the time Officer Hattis partially blocked the driveway exit and approached the Guy car. In the course of his testimony he stated it was he, not the rear seat passenger, who handed Officer Hattis his driver's license. Over defense objection, the prosecutor was permitted to question Robert Guy as to whether he had made a contrary statement to a police officer in the hospital later in the day of the occurrence. Robert Guy acknowledged that a police officer had approached him in the hospital to talk about the occurrence, but asserted he had told the police officer nothing. Later a police officer testified that he had talked with Robert Guy in the hospital on June 17th and that Robert Guy told him that it was the back-seat passenger who had presented Robert Guy's driver's license to Officer Hattis. The jury was instructed that any testimony concerning such out-of-court statement could be used for impeachment purposes only and not as substantive evidence. Defendant claims that whether Robert Guy or the back seat passenger, Willie Guy, presented the driver's license to Officer Hattis is a matter completely collateral to the charge of carrying a concealed weapon, and it was, therefore, error to permit extrinsic evidence of Robert Guy's inconsistent statement on this subject.

Initially, we note that, although defendant objected to the questions put to Robert Guy as to whether he had made an inconsistent out-of-court statement, no objection was made to the testimony of the officer who heard and related the statement.

Thus the issue of the admissibility of the officer's testimony was not properly preserved for review. However, even if the issue had been properly preserved, we would disagree with defendant's position.

The purpose of the rule that a witness cannot be impeached on a collateral matter by use of extrinsic evidence is to avoid the waste of time and confusion of issues that would result from shifting the trial's inquiry to an event unrelated to the offense charged. In order to apply the rule it is necessary to determine what facts are deemed "collateral". According to McCormick, Evidence (2d ed), § 47, p 98, facts which would have been independently provable are not considered collateral for the purpose of this rule. The facts here involved concerned which person presented Robert Guy's driver's license to establish identity. Officer Hattis testified on the same subject without objection. The obvious assumption of both counsel at the time of Hattis's testimony was that the events transpiring just before the discovery and seizure of the weapon from the defendant were so closely connected that testimony of the prior events was relevant and admissible. Since evidence concerning the presentation of the driver's license was independently provable, such fact would not be deemed collateral and Robert Guy could be impeached on this subject by the use of extrinsic evidence. The impeaching extrinsic evidence could be the contradictory testimony of another witness, such as Officer Hattis, who personally observed the event, or proof of an inconsistent out-of-court statement on the subject by the witness sought to be impeached.

In further discussing the application of the rule, McCormick indicates there are three kinds of facts that are not considered to be collateral. The first

consists of facts directly relevant to the substantive issues in the case. The second consists of facts showing bias, interest, conviction of crime and want of capacity or opportunity for knowledge. The third consists of any part of the witness's account of the background and circumstances of a material transaction which as a matter of human experience he would not have been mistaken about if his story were true. The testimony about the driver's license seems to fall in the latter category and as to such category McCormick has this comment:

"This test is of necessity a vague one because it must meet an indefinite variety of situations, and consequently in its application a reasonable latitude of discretionary judgment must be accorded to the trial judge." *Ibid,* 99-100.

We are not persuaded that the trial judge exceeded the bounds of "a reasonable latitude of discretionary judgment" in allowing extrinsic proof of the inconsistent statement for impeachment purposes.

IV. *Was prejudicial error committed in connection with the exercise by a witness of the privilege against self-incrimination?*

Officer Shouldice was called as a witness by the prosecution. He testified on direct examination that on June 17th, the date of the incident, he had been employed by the Battle Creek Police Department but left that position a few weeks later. At the time of the trial he worked part-time for a township police department and part-time at a community college, where he was assistant coordinator for the Police Academy run by the college, and was also working on a masters degree.

The substance of his version of the events of the

morning in question has already been related, but these additional facts should be noted: During part of the fray between defendant and the other officers, Shouldice held his own gun pointed at defendant's head from a few inches away, and for another part of the fray, Shouldice, with his gun holstered, held the legs of the defendant. Although he saw defendant several times appear to reach toward his waist area and heard one of the other officers say, "He's got a piece", Shouldice himself neither saw nor felt a weapon on defendant and did not see any officer remove a weapon from defendant's possession.

As the prosecutor completed his direct examination of Officer Shouldice, the prosecutor asked for a recess to review his notes. Before the trial resumed in front of the jury, the prosecutor moved in chambers to exclude cross-examination "on the matter of Mr. Shouldice's leaving the police department". The officer was asked to state to the court his reasons for leaving. He informed the court as follows:

> "*The Witness:* We were—Some allegations were leveled against myself and another officer. The department conducted an internal investigation. No evidence or proof was leveled against either of us.
>
> "However, the city felt it was in their own best interest to terminate our employment. And, due to the fact that I was not covered by the contract at the time, I chose to resign.
>
> "*The Court:* Was this the firecracker incident?
>
> "*The Witness:* Yes."

Later remarks by counsel indicated that the incident referred to involved allegations that the officer had thrown firecrackers at the defendant's house. The court opined that the defendant had

the right to cross-examine the officer on the subject, on the basis that it did go to the question of the witness's bias or prejudice. The prosecutor then stated that he thought the witness should be advised of his right to an attorney, and the witness indicated that he would like to have the opportunity to consult with an attorney. It was agreed that cross-examination would proceed, but that no questions would be asked concerning the officer's reasons for resignation from the Battle Creek Police Department until he had consulted with an attorney. An attorney for the witness eventually advised the court that the witness would indeed "take the fifth amendment" as to any questions regarding the incident which led to the witness's resignation from the police department. The court thereupon ruled that in the presence of the jury defense counsel would have the right to inquire as to why the witness resigned and elicit the response that the witness was afforded the opportunity to either resign or face disciplinary action and that the proposed disciplinary action concerned an alleged incident involving the witness and the defendant. The court further ruled, however, that defense counsel could not ask questions which would elicit the claim of Fifth Amendment privilege. The prohibited inquiry was the involvement of the witness in the alleged fireworks incident itself. Cross-examination of Shouldice continued with defense counsel adhering to the guidelines prescribed by the court.

Defendant claims it was prosecutorial misconduct, constituting error requiring reversal, for the prosecutor to call a witness whom he knew or should have known would invoke the privilege against self-incrimination. We disagree. A prosecutor is prohibited from calling as a witness an

alleged accomplice of a defendant whom the prosecutor knows will assert the Fifth Amendment privilege, in the expectation that the jury will draw inferences adverse to the defendant. *People v Giacalone,* 399 Mich 642; 250 NW2d 492 (1977). Shouldice was not an alleged accomplice and the prosecutor did not call him for the purpose of impressing upon the jury his claim of privilege to create an inference adverse to defendant.

Defense counsel further claims it was prejudicial misconduct for the prosecutor to wait to bring his motion until direct examination of the witness had been completed, when he could have brought the motion in advance of the trial. Although it may have been possible for the prosecutor to have brought his motion in advance of trial, there is no showing that the failure to do so was a deliberate ploy to surprise or ambush defense counsel. Moreover, any surprise was alleviated by the fact that the motion was made on a Friday but not ruled upon until the following Tuesday morning when the witness's counsel notified the court that the Fifth Amendment privilege would be claimed. Defense counsel has not pointed to any prejudice resulting from failure to bring the motion in advance of the trial, and we are unable to find error relating to the timeliness of the motion.

Defendant's next argument is that Shouldice, by testifying on direct examination that he had left the Battle Creek Police Department, waived his right to assert the Fifth Amendment privilege regarding further details of his leaving. This argument fails to recognize the substantial distinction between the Fifth Amendment privilege of a defendant on trial and the Fifth Amendment privilege of a witness. The privilege of a defendant on trial is not only to avoid giving incriminating

responses to inquiries put to him, but also to be free from the inquiries themselves. A defendant on trial, therefore, waives his privilege when he subjects himself to inquiry by voluntarily taking the witness stand. A mere witness, on the other hand, has only the privilege of not giving an incriminating response to an inquiry put to him. The fact that a witness answers a question on a particular subject without invoking the privilege would not waive his right to invoke the privilege in response to a subsequent question on the same subject, unless the answer to the subsequent question would reveal no more incriminating information than was revealed in the response to the earlier question. McCormick, Evidence (2d ed), § 140, pp 296-297. Thus the witness's testimony on direct examination that he had left the Battle Creek Police Department would not be a waiver of his Fifth Amendment privilege with respect to events that led to his resignation.

The defendant further contends it was error to permit the witness to exercise his Fifth Amendment privilege with respect to the alleged firecracker incident because the danger of incrimination was not "real and appreciable". Defendant points to the fact that more than a year had elapsed since such incident and there was no proof that prosecution was being considered and asserts that the only real threat against the witness was the possibility that he would not be reinstated to his former position in the Battle Creek Police Department. It is true that the privilege cannot be invoked for any purpose other than protection against incrimination, but there are criminal laws prohibiting the possession, transporting, using or exploding of firecrackers. MCL 750.243a; MSA 28.440(1). The fact that the criminal process was

not in progress or was not planned is immaterial. It is "the now prevailing general judicial attitude that almost any conceivable danger (of incrimination) is 'real and appreciable' ". McCormick, Evidence (2d ed), § 123, p 263.

Defendant next claims that permitting the witness to exercise his Fifth Amendment right denied the defendant his constitutional right of confrontation.[3]

The right of cross-examination is the essence of the Sixth Amendment right of confrontation. If cross-examination of a prosecution witness has been unreasonably limited, a conviction based upon the testimony of such witness cannot be sustained. *People v Mobley,* 390 Mich 57; 210 NW2d 327 (1973). Distinctions must be made in the nature of the limitation.

"In determining whether the testimony of a witness who invokes the privilege against self-incrimination during cross-examination may be used against the defendant, a distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination.

---

[3] This issue would be more properly presented if a motion to strike the witness's testimony had been made when the court upheld the exercise of the privilege. See Anno, *Propriety of court's failure or refusal to strike direct testimony of government witness who refuses, on grounds of self-incrimination, to answer questions on cross-examination,* 55 ALR Fed 742. However, we do not fault defendant's counsel for failure to make a motion to strike. He vigorously objected to the court's permitting the exercise of the privilege. By the time the trial court made its final decision allowing the exercise of the privilege the witness had not only completed his direct examination but had been extensively cross-examined and there is no way the officer's testimony could be effectively erased from the minds of the jurors. A motion to strike is an effective procedure where the granting of it would remove from the case testimony so essential to the prosecution that without it the case would collapse. This was not the situation here.

Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him. * * * On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part." (Citations omitted.) *United States v Cardillo,* 316 F2d 606, 611 (Ca 2, 1963).

We recognize that it has been held that if the questions on cross-examination to which the claim of privilege is invoked relate to the bias or prejudice of the witness and not just to his general credibility, the direct testimony may be subject to being stricken. *United States v Garrett,* 542 F2d 23 (CA 6, 1976).

We decline to hold that the limitation in cross-examination of witness Shouldice arising from his exercise of the privilege against self-incrimination was so substantial that use of the direct testimony was prejudicial error. We list three reasons for so holding: First, invoking the privilege did not in any way insulate the witness from cross-examination concerning events at the time of the defendant's arrest and the discovery of the weapon. Second, defendant was permitted to establish by cross-examination that the witness had left the Battle Creek Police Department under pressure to resign because of an incident involving this defendant, and, therefore, was able to establish substantial reasons for bias or prejudice on the part of this witness against the defendant. Third, this witness was not a crucial witness for the prosecution. He testified that he neither saw nor felt a weapon on the defendant, nor did he see a weapon

removed by the other officers. Thus Shouldice did not testify as to the existence of any of the elements of the crime charged, and such elements were established solely by the testimony of other witnesses. This point is underscored by review of defense counsel's summation to the jury. Shouldice was mentioned several times in the course of that summation but defense counsel did not suggest that Shouldice was biased or prejudiced or should not be believed. On the contrary, he pointed out that Shouldice was close to the defendant during the entire struggle, and yet never saw or felt a weapon on the defendant nor did he see a weapon taken from defendant. Defense counsel's argument to the jury was that, since Shouldice never saw a weapon on the defendant, he did not have one. It would be anomalous to reverse a conviction on the ground the defendant had been unable to show that a witness was biased when defendant's argument to the jury was that the witness's testimony on the crucial facts of the existence of the offense was correct and should be relied upon by the jury to find the defendant not guilty.

It is defendant's final claim that error occurred in the manner in which the privilege was invoked. The privilege was invoked in chambers by an attorney for the witness informing the judge that he had advised the witness to invoke the privilege and that the witness desired to do so. The defendant asserts this was error, and we agree.

"The privilege of one not an accused is a privilege to decline to respond to inquiries, not a prohibition against inquiries designed to elicit responses incriminating in nature. Because of this difference in the nature of the privilege of one not an accused, the manner of invoking it correspondingly differs from the manner of invoking the privilege of an accused. Thus by universal holding,

one not an accused must submit to inquiry (including being sworn, if the inquiry is one conducted under oath) and may invoke the privilege only after the potentially incriminating question has been put. Moreover, invoking the privilege does not end the inquiry and the subject may be required to invoke it as to any or all of an extended line of questions." McCormick, Evidence (2d ed), § 136, p 289.

The rationale for the approach that the witness must submit to questions on the stand is that, were it otherwise, the option of refusal to answer would be turned into a prohibition against inquiry. *Hutcheson v United States,* 369 US 599, 619; 82 S Ct 1005; 8 L Ed 2d 137 (1962). The manner in which the privilege was invoked, therefore, was in error. Was it harmless error? The points of inquiry to determine whether an error is harmless are prescribed in *People v Robinson,* 386 Mich 551, 563; 194 NW2d 709 (1972), as follows:

"First, is the error so offensive to the maintenance of a sound judicial process that it never can be regarded as harmless? * * * Second, if not so basic, can we declare a belief that the error was harmless beyond a reasonable doubt?" (Citations omitted.)

We do not believe that the error was so offensive to the maintenance of a sound judicial process that it never can be regarded as harmless. The witness did have the right to exercise the privilege. An infinite variety of circumstances may surround the invoking of the privilege. It would be arbitrary and unreasonable to hold that the integrity of the judicial process is undermined whenever the privilege is not exercised by the witness himself and in the presence of the jury.

As to the second prong of the *Robinson* test, we do declare a belief that the error was harmless

beyond a reasonable doubt, based upon the same three reasons previously given for holding that the direct testimony of the witness should not be stricken.

Affirmed.