# IN THE SUPREME COURT OF IOWA

No. 18–0483

Filed December 20, 2019

**STATE OF IOWA,**

Appellee,

vs.

**KARI LEE FOGG,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Boone County, Paul G. Crawford (motion to suppress) and Stephen A. Owen (trial), District Associate Judges.

A defendant appeals her conviction for operating while intoxicated first offense, contending that her motion to suppress should have been granted. **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender (until withdrawal), and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Genevieve Reinkoester, Assistant Attorney General, Dan Kolacia, County Attorney, and Matthew Speers, Assistant County Attorney, for appellee.

**MANSFIELD, Justice.**

A police officer saw a vehicle driving suspiciously for several minutes in a residential neighborhood at night at a snail's pace of ten miles per hour. After the vehicle entered a one-lane alley that ran between two streets and then did not emerge from the alley, the officer approached the stopped vehicle from the front without activating flashers. He stopped his own patrol car at least twenty feet away, turned the lights down to low beam, got out of his patrol car, and walked up to the driver to engage in a conversation. This resulted in the officer learning that the driver was under the influence of alcohol. Eventually it resulted in the driver's conviction for driving while intoxicated.

The issue we must decide on appeal is whether the driver was seized for purposes of the Fourth Amendment to the United States Constitution or article I, section 8 of the Iowa Constitution when the officer approached her on foot that evening. We agree with the district court and the court of appeals that she was not and accordingly affirm the judgment of the district court and the decision of the court of appeals.

### I. Facts and Procedural History.

At about 9:50 p.m. on October 10, 2017, Officer Michael Frazier of the Boone Police Department was patrolling in residential neighborhoods of the city east of the hospital area. He noticed that a silver Hyundai was going very slowly—about ten miles per hour in a twenty-five-mile-per-hour zone. After about three or four minutes, he saw the Hyundai proceed north from Second Street into an alley that paralleled Clinton and Jackson Streets. The alley is wide enough for one lane of traffic and has various driveways that access it. Officer Frazier proceeded up Clinton Street to Third Street and waited for the vehicle to exit the alley. When the vehicle did not come out of the alley, Officer Frazier turned east on Third Street

where he saw the Hyundai "had stopped in the mid-block in the alley and just kind of parked there." He "saw the vehicle was still sitting there not knowing if it was occupied or not." Officer Frazier decided to turn south into the alley and pull in front of the Hyundai "to see what was going on." The lights of the Hyundai were still on, but Officer Frazier could not tell whether anyone was in the vehicle until he pulled into the alley.

Officer Frazier did not activate his flashers. Instead, he parked his patrol car at least twenty feet from the Hyundai, left his own low beams on, got out, and walked up to the Hyundai. At that point, the driver of the Hyundai, Kari Fogg, opened her door. Officer Frazier asked "whether everything was okay, what was going on." Fogg responded that "she lived in the area and was checking to see if the alley was crooked or something to that effect, that she had to report to the city."

Officer Frazier smelled a strong odor of an alcoholic beverage coming from the vehicle. He also noticed red and watery eyes and some slightly slurred speech. He asked Fogg how much she had had to drink that evening, and she initially stated "nothing." Soon thereafter she changed her answer and said she had had two glasses of wine. Fogg was asked to perform some field sobriety tests. She failed them. Fogg refused a preliminary breath test and was arrested for operating while intoxicated (OWI). At the jail, Fogg refused a chemical test.

Fogg was charged with OWI, first offense, in violation of Iowa Code section 321J.2. *See* Iowa Code § 321J.2(1)(*a*), (2)(*a*) (2017). Fogg moved to suppress all evidence derived from Officer Frazier's encounter with her in the alley, alleging that she was seized without reasonable suspicion in violation of both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. An evidentiary hearing was held. Officer Frazier testified, and an overhead photograph of the alley

was introduced into evidence. On the photograph, Officer Frazier marked where the Hyundai and his patrol car were parked.

Officer Frazier testified that the vehicle had been driving suspiciously and that it was suspicious for it to be parked in an alley. During the summer, Officer Frazier had taken seventeen burglary reports within the city himself and probably six or so were from that area.

The alley is a public alley. Traffic is permitted in either direction, but it is only wide enough for one vehicle to proceed at a time without driving into someone's yard. Once Officer Frazier pulled in with his patrol car and stopped a couple of car lengths in front of Fogg's Hyundai, for Fogg to leave she would have had to back up about 125 feet to exit the alley or turn around in a driveway that fronted on the alley. Fogg's vehicle was parked near one of those driveways that led into a garage. It also turned out that she lived only about a block from where she had stopped the Hyundai in the alley.

The district court denied Fogg's motion to suppress. While acknowledging that "[i]t's a close call," the court found that Fogg had not been seized at the time Officer Frazier stopped in the alley and walked up to her vehicle. The court also alternatively found that Officer Frazier had reasonable suspicion that criminal activity may have been afoot and would have been justified in stopping Fogg's vehicle anyway.

Following a jury trial, Fogg was convicted of OWI, first offense and sentenced to two days in jail plus a fine and surcharges. *See* Iowa Code § 321J.2(3). Fogg appealed, arguing that her motion to suppress should have been granted and that her counsel had been ineffective in failing to object to certain statements made by the prosecutor during rebuttal closing argument.

We transferred the case to the court of appeals. That court affirmed the conviction. Based on a de novo review of the record and consideration of the totality of the circumstances, the court of appeals concluded that "Fogg was not subjected to a seizure in the constitutional sense." The court also determined that Fogg's trial counsel had not been ineffective in failing to object to the prosecutor's statements during rebuttal closing argument. We granted Fogg's application for further review.[1]

## II. Standard of Review.

As we have said recently,

> "When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." We examine the whole record and "make 'an independent evaluation of the totality of the circumstances.'" "Each case must be evaluated in light of its unique circumstances."

*State v. Coffman*, 914 N.W.2d 240, 244 (Iowa 2018) (first quoting *State v. Storm*, 898 N.W.2d 140, 144 (Iowa 2017); and then quoting *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012)).

## III. Legal Analysis.

Fogg argues that she was seized on October 10, 2017, in violation of her rights under the Fourth Amendment and article I, section 8. However, she does not argue for a separate Iowa constitutional analysis.

> When a party does not suggest a framework for analyzing the Iowa Constitution that is different from the framework utilized under the United States Constitution, we apply the general federal framework. However, we reserve the right to apply the federal framework in a different manner.

---

[1]When we grant further review, we may exercise our discretion to let the court of appeals decision stand as the final decision on particular issues. *See State v. Henderson*, 908 N.W.2d 868, 875 (Iowa 2018). Here, Fogg sought further review only on the issue of whether she had been seized when Officer Frazier approached her on October 10, 2017. We exercise our discretion to let the court of appeals decision stand as the final decision on whether her trial counsel was ineffective in failing to object to statements made by the prosecutor during rebuttal closing argument.

*In re Det. of Anderson*, 895 N.W.2d 131, 139 (Iowa 2017) (citation omitted).

The threshold question under both constitutions is often whether there has been a seizure: "In order for the Fourth Amendment [or article I, section 8] to apply in this case, there must first be a 'seizure.'" *State v. Wilkes*, 756 N.W.2d 838, 842 (Iowa 2008).

Hence, we must determine whether Officer Frazier "seized" Fogg prior to reasonably suspecting Fogg of operating a motor vehicle while intoxicated. If no seizure occurred, a motion to suppress on that ground is without merit.

The defendant has the burden of proof as to whether a seizure occurred. *See* 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.2(b), at 58–59 (5th ed. 2012) [hereinafter LaFave, *Search and Seizure*] ("The defendant . . . has the burden of proof as to . . . whether a seizure occurred."). We explored the question of whether a seizure had occurred extensively in *Wilkes*, 756 N.W.2d at 841–45. The facts of *Wilkes* are somewhat similar to those here—a vehicle was parked at night, and a police officer decided to investigate, pulling his patrol car near to the vehicle, getting out, and walking up to the driver side of the vehicle.

> Atlantic Police Officer Paul Wood and a reserve officer were riding in a patrol car on routine duty the night of January 12, 2007. Around midnight, Wood spotted a white truck with its headlights on and its engine running parked in Schildberg's Quarry. Although the record does not reveal the exact temperature, Wood testified that it was "pretty cold outside."

> Wood pulled the patrol car into the quarry "to make sure everything was okay with the driver." While approaching the vehicle, Wood did not activate his emergency lights or siren. He pulled his patrol car to a distance of about ten or fifteen feet from the truck. Although the quarry had only one entrance, the patrol car did not block the entrance in any way.

> After pulling up behind the truck, Wood and the reserve officer exited the patrol car and approached the vehicle. Wood observed that the truck was occupied by two people. Wood approached on the driver's side of the truck and the reserve officer walked toward the truck on the passenger side but stayed behind the vehicle. When Wood arrived at the driver's window, he "basically asked what was going on" and "made sure everything was okay." Through the opened driver's window, Wood smelled the strong odor of an alcoholic beverage coming from the driver.

*Id.* at 840–41.

In *Wilkes*, we reviewed both our own precedents and those of the United States Supreme Court. *Id.* at 842–44. We pointed out that whether a seizure occurred is determined by "the totality of the circumstances." *Id.* at 842. We quoted the Supreme Court for the proposition that a seizure does not occur if "a reasonable person would feel free 'to disregard the police and go about his business.'" *Id.* at 843 (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386 (1991)). Yet, we indicated that "objective indices of police coercion must be present to convert an encounter between police and citizens into a seizure." *Id.* at 843. We added that "[t]he element of coercion is not established by ordinary indicia of police authority." *Id.*

In *Wilkes* we discussed *State v. Harlan*, a case where we had held that an officer who parked his patrol car behind the defendant's stopped car, walked up to the defendant's car, and shined a flashlight into the car did not "seize" the defendant. *See Wilkes*, 756 N.W.2d at 843–44 (discussing *Harlan*, 301 N.W.2d 717, 719–20 (Iowa 1981)). We then commented on the similarity between *Wilkes* and *Harlan*. *Id.* at 844. We found that no seizure occurred even though the officer parked behind the defendant's vehicle, shined headlights in the defendant's vehicle, and walked up to the defendant's vehicle in uniform. *Id.* We emphasized that "the use of ordinary headlights at night is simply not coercive in the same

manner as the activation of emergency lights which invoke police authority and imply a police command to stop and remain." *Id.* We also found that the defendant's ability "to drive away was not substantially impaired," because "there were at least two ways for him to turn his truck around and leave the quarry, had he chosen to do so." *Id.*

We concluded as follows: "Simply put, neither of the officers displayed coercive or authoritative behavior to transform this encounter into a seizure for Fourth Amendment purposes." *Id.*

The overview that we provided in *Wilkes* is sound law, and it remains the law today. We recognize that one of the norms of society we have grown up with is that we should cooperate with law enforcement. Fogg may have been operating under that norm. However, for a *seizure* to occur, there must be more—"objective indices of police coercion," "[t]he element of coercion," or "coercive or authoritative behavior." *Id.* at 843, 844. One way of looking at the matter is whether the officer was simply engaging in activity that any *private* person would have a right to engage in. *See id.* at 844; *Harlan*, 301 N.W.2d at 720.

Under the circumstances of this case, we conclude there was no seizure. Officer Frazier never activated the emergency lights on his vehicle. He parked at least twenty feet away from Fogg's parked vehicle and approached her on foot. He did not shine a light into or knock on Fogg's vehicle. In fact, Fogg opened her car door before Officer Frazier arrived. Officer Frazier engaged in conversation to ask if everything was ok and what was going on. None of this is objectively coercive.

Fogg's appeal boils down to a simple point. The alley was only wide enough for one car at a time, and by driving down it from the north, Officer Frazier created a situation where she would have had to leave by backing up about 125 feet to the south.

But the alley was a public alley that was not posted for a single direction of traffic. Officer Frazier had as much right to pull in from the north and park as Fogg did to pull in from the south and park. Officer Frazier was not doing something a private person could not have done.

At oral argument, Fogg's counsel suggested that in order to have a consensual encounter with Fogg rather than a seizure, Officer Frazier could have chosen one of two alternatives. First, he could have parked on Third Street and then walked down the alley until he reached Fogg's vehicle. Second, he could have driven all the way around the block and then approached Fogg's vehicle from behind and parked behind her.

Both alternatives would have taken more time and would have involved a less direct and convenient route to Fogg's vehicle. We do not believe the Fourth Amendment or article I, section 8 require Officer Frazier to undergo this extra time and inconvenience. Moreover, the first alternative would have likely increased the personal risk to Officer Frazier by separating him from his vehicle. The second alternative could have made Fogg feel more apprehensive: it was 9:50 p.m., and she might have been unable to tell that the vehicle approaching her from behind was a patrol car.

Additionally, on our de novo review of the record, we conclude that Fogg would not have needed to back up 125 feet to leave. The aerial photograph of the alley shows at least three spots between Fogg's current location and Second Street where Fogg could have turned around. Officer Frazier did initially testify that for Fogg to leave, she would have to back up the alley all the way to Second Street. However, at the end of cross-examination, Fogg's counsel asked him to review the aerial photograph again. At this point Officer Frazier confirmed the presence of two garages

(each of which is shown on the photograph as having a driveway) and one driveway without garage. All of these opened onto the alley and were accessible to Fogg's vehicle as places where she could have turned around her vehicle. One was very near to Fogg's vehicle.

This was not a situation where the police officer "activate[d] his emergency lights and block[ed] in [the defendant's] parked vehicle." *Kurth*, 813 N.W.2d at 278. Nor was it a situation where the officer parked his vehicle in the middle of the defendant's driveway, blocking in the defendant's vehicle; left the emergency lights on; and insisted that the defendant return from his front porch to the driveway and talk to him. *See State v. White*, 887 N.W.2d 172, 176–77 (Iowa 2016) (per curiam).

It is true that Fogg could not have driven forward. However, she could have driven backward either with or without turning around. She was not "boxed in." 4 LaFave, *Search and Seizure* § 9.4(a) n.122, at 596–97. "[T]here was an avenue by which [Fogg] could have actually left." *County of Grant v. Vogt*, 850 N.W.2d 253, 265, 268 (Wis. 2014) (finding no seizure when the deputy pulled up behind a vehicle in a parking lot, got out, and knocked on the window of the defendant's car because the defendant could have "pulled forward and turned around"). "[Fogg] could have backed up and driven away from the encounter . . . ." *State v. Randle*, 276 P.3d 732, 732, 735, 739 (Idaho Ct. App. 2012) (upholding the denial of a motion to suppress when an officer parked two car lengths behind the defendant's car which was abutting a grassy knoll, approached the vehicle, and knocked on the driver's side window); *see also Erickson v. Comm'r of Pub. Safety*, 415 N.W.2d 698, 701 (Minn. Ct. App. 1987) (upholding the denial of a motion to suppress when "the officers parked their vehicles in front of the entryway and by appellant's truck in order to

be as close as possible to the entrance, and not to intentionally block and seize appellant").

As LaFave has explained, after recognizing that there are "moral and instinctive pressures to cooperate" with the police,

> [T]he confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse. The critical factor is whether the policeman, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner which would be perceived as a nonoffensive contact if it occurred between two ordinary citizens.

4 LaFave, *Search and Seizure* § 9.4(a), at 581–82 (footnotes omitted). We agree with the courts below that no seizure occurred under the Fourth Amendment or article I, section 8 until after Officer Frazier observed the signs of intoxication on Fogg.

**IV. Conclusion.**

For the foregoing reasons, we affirm Fogg's conviction and sentence.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Appel, J., and Wiggins, C.J., who dissent.

**APPEL, Justice (dissenting).**

In this case, we consider whether an automobile driver was seized when a uniformed officer approached the vehicle after blocking the exit to a residential alleyway with his patrol car. If the driver was, in fact, seized, we then consider whether the warrantless seizure was supported by reasonable suspicion of criminal activity or allowable as a community caretaking function.

The defendant filed a motion to suppress evidence of operating while intoxicated (OWI) obtained by police as a result of the incident. The district court, while finding the question of a seizure "a close call," held that the police had reasonable suspicion that criminal activity might be afoot in light of recent residential burglaries in the area.

The majority today upholds the district court in finding that no seizure occurred under the Fourth Amendment of the United States Constitution or article I, section 8 of the Iowa Constitution. For the reasons expressed below, I strongly disagree and instead would vacate the court of appeals ruling, reverse the district court's order, and remand the case to the district court.

### I. Factual and Procedural Background.

Shortly before 10:00 p.m. on the evening of October 10, 2017, Boone Police Officer Michael Frazier was patrolling the east side of the city. The officer saw a silver Hyundai driving slowly through a residential neighborhood at a speed the officer estimated was ten miles per hour. The vehicle turned into a narrow alleyway and stopped midway in the alley with its lights on.

Officer Frazier decided to "see what was going on." The officer circled back, entered the alley from the opposite direction, and stopped his patrol

vehicle, with the headlights on, in front of the Hyundai. Then, Officer Frazier initiated procedures to determine the ownership of the vehicle by running the license plate number as he alighted and approached the vehicle.

As Officer Frazier approached, Kari Fogg opened her car door and exited the vehicle. She told the officer she was checking to see if the alley was crooked. The officer stated he smelled alcohol on her breath and commenced an OWI inquiry. Subsequently, Fogg admitted to consuming two glasses of wine and some prescription medication prior to driving.

Officer Frazier asked Fogg to perform a series of roadside sobriety tests. Frazier detected six clues on Fogg's horizontal-gaze nystagmus test and also noted the presence of vertical-gaze nystagmus. Fogg attempted to walk and turn but did not complete the test, indicating concern that she would fall. She declined to perform the one-legged stand. Frazier requested a preliminary breath test, which Fogg declined.

At that point, Officer Frazier arrested Fogg and took her to the police station. At the station, Frazier gave Fogg the opportunity to call an attorney, but Fogg was unable to reach one. She refused to consent to the blood test.

Fogg was subsequently charged with OWI, first offense, under Iowa Code section 321J.2 (2017). Fogg filed a motion to suppress all evidence because Frazier had no probable cause or reasonable suspicion to stop her and the warrantless stop violated the search and seizure provisions of the Iowa Constitution, article I, section 8 and the Fourth Amendment of the United States Constitution.

The State resisted the motion to suppress. The State asserted the encounter between Officer Frazier and Fogg was consensual and not a seizure, thereby avoiding the warrant requirements under the Iowa and

Federal Constitutions. In the alternative, the State argued that if there was a seizure, the warrantless stop was supported by reasonable suspicion that Fogg was driving under the influence or the conduct was justified under the community caretaking exception to the warrant requirement. The resistance did not suggest that Officer Frazier had reasonable suspicion about a burglary in progress.

At the suppression hearing, however, Frazier was asked on direct examination if he was suspicious that a particular crime was being committed. He stated,

> I wasn't sure. A lot of burglaries happen on that side of town, so I wasn't sure if someone was getting dropped off to do vehicle burglaries or garage burglaries in the area. It was just all around suspicious. Just wanted to make sure they were okay.

Counsel sought a clearer explanation of Frazier's reasoning during cross-examination. Frazier testified, "At that time I really didn't know until I made contact. I didn't know what was going on." Pressed further, Frazier stated,

> I had no idea, sir. I thought it was a possibility something was going on or it was somebody who was broken down in the alley. I didn't know.
>
> . . . .
>
> . . . A. I was suspicious of her driving behavior before then where she was parked at at the time or where she had stopped at.

The district court denied the motion to suppress. According to the district court, the question of whether a seizure occurred "was a close call." But even if there was a seizure, the district court concluded that Officer Frazier had reasonable suspicion that a burglary was in progress.

The case proceeded to trial. At trial, two witnesses testified: Fogg and Frazier. Officer Frazier's interactions with Fogg were captured on video and presented to the jury.

Officer Frazier was asked again about the nature of his activity that night. Frazier confirmed that he was patrolling one of the neighborhoods "on the east side [of Boone]." In approaching the car, Frazier stated,

> I wasn't sure what this person was doing. I didn't know who –- I hadn't run the license plate. I didn't know who it was. A male or female, young or old, if they lived in the neighborhood. I was concerned with burglaries over the summertime, that someone was maybe cruising the alleys casing some garages. I just -– I didn't know what was going on. The behavior was strange.

The jury convicted Fogg. She now appeals. For the reasons expressed below, the court should have reversed.

**II. Standard of Review.**

I conclude, along with the majority, that a challenge to a motion to suppress on state or federal constitutional grounds is reviewed de novo. *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011). Indeed, the appellate court undertakes "an independent evaluation of the totality of the circumstances as shown by the entire record." *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001) (quoting *State v. Howard*, 509 N.W.2d 764, 767 (Iowa 1993)). However, the allocation of burden in this case is worthy of emphasis: The state bears the burden of showing by a preponderance of the evidence that an officer's warrantless seizure was constitutional. *State v. Tague*, 676 N.W.2d 197, 201 (Iowa 2004).

**III. Discussion.**

**A. Introduction.** In order to resolve the issues in this case, we must answer a series of questions, the first being whether Fogg was subject to a seizure under the Iowa or Federal Constitution. If she was

not, there is no basis to suppress the evidence offered at trial that resulted in her conviction.

The State claimed in the district court that Officer Frazier had reasonable suspicion to believe that criminal activity was afoot and thus a warrant was not required. Alternatively, the State argued that the seizure was supported by the community caretaking exception to the warrant requirement. In its brief on appeal, however, the State does not defend the actions of Frazier based on these exceptions to the warrant requirement. The State's briefing before this court relies solely on whether there was a seizure in this case.

Fogg also claims that her conviction should be reversed because of prosecutorial misconduct arising from what she claims were improper arguments made to the jury by the prosecutor during rebuttal. The State contends that even if the prosecutor's arguments were impermissible, Fogg cannot show she was prejudiced by them.

**B. Was There a Seizure?**

1. *Introduction.*

> No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear authority of law.

*Union Pac. Ry. v. Botsford,* 141 U.S. 250, 251, 11 S. Ct. 1000, 1001 (1891). The "inestimable right of personal security belongs as much to citizens on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio,* 392 U.S. 1, 8–9, 88 S. Ct. 1868, 1873 (1968).

The warrant requirement is designed to provide broad protection by "safeguard[ing] the privacy and security of individuals against arbitrary

intrusion by government officials." *State v. Crawford,* 659 N.W.2d 537, 541 (Iowa 2003) (quoting *State v. Brecunier,* 564 N.W.2d 365, 367 (Iowa 1997)). The warrant requirement includes not only particularity but a requirement of antecedent justification central to search and seizure law. *State v. Short,* 851 N.W.2d 474, 502 (Iowa 2014). Indeed, as Justice Jackson stated long ago,

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Johnson v. United States,* 333 U.S. 10, 13–14, 68 S. Ct. 367, 369 (1948).

Here, it is undisputed that Officer Frazier did not have a warrant to search or seize Fogg. Warrantless seizures are per se unreasonable unless an exception to the warrant requirement exists. *State v. Hoskins,* 711 N.W.2d 720, 725–26 (Iowa 2006). The question here is whether a warrantless seizure occurred.

2. *Positions of the parties.* Fogg maintains that she was seized because no reasonable person, under the circumstances, would have felt free to leave the alley. Fogg points out that Officer Frazier blocked her egress from the alley with his patrol car. She points to testimony from Frazier that she could not have proceeded down the one-lane alley without driving over residential lawns. The only other option, Fogg contends, would have been driving in reverse, in the dark, down the narrow alley for about 125 feet while the headlights from the officer's car were shining in her face. Under these circumstances, her ability to drive away was substantially impaired, a significant factor in the determination of whether

a seizure has occurred under *State v. Wilkes*, 756 N.W.2d 838, 843–44 (Iowa 2008).

The State agrees with Fogg that the test of whether a seizure occurs is whether a reasonable person would feel free to leave and that the question is determined based on the totality of the circumstances. *Id.* at 842; *State v. Reinders*, 690 N.W.2d 78, 82 (Iowa 2004). According to the State, however, the facts and circumstances of the interaction between Fogg and Frazier show not a seizure but a consensual encounter. *See United States v. Drayton*, 536 U.S. 194, 201, 122 S. Ct. 2105, 2110 (2002) (stating absent coercive means, "[i]f a reasonable person would feel free to terminate the encounter, then he or she has not been seized").

The State emphasizes that ordinary indicia of authority—such as a badge, the fact that an officer is in uniform, or the fact that an officer is visibly armed—has little weight in the analysis. *See Reinders*, 690 N.W.2d at 82 ("Police questioning by itself, however, is generally not a seizure."); *State v. Pickett*, 573 N.W.2d 245, 247 (Iowa 1997) ("A seizure occurs when an officer by means of physical force or show of authority in some way restrains the liberty of a citizen."); *cf. State v. White*, 887 N.W.2d 172, 176–77 (Iowa 2016) (per curiam) (finding a seizure occurred when a uniformed officer, displaying both gun and badge, blocked defendant's garage and insisted defendant speak with him). The State emphasizes that Officer Frazier did not activate his emergency lights to signal the defendant to pull over. *See State v. Harlan*, 301 N.W.2d 717, 720 (Iowa 1981) ("The use of sirens, flashing lights or other signals to pull a moving vehicle to the side of the road might also constitute a show of authority that is a seizure."). The State asserts that the defendant's car was already parked and that Officer Frazier merely parked twenty feet away, then approached the defendant's vehicle, but did not issue any commands. The State

additionally reasons that Fogg could have exited the narrow alleyway by either driving in reverse or using a private driveway to turn her car around and leave.

3. *United States Supreme Court precedent.*  Under the United States Constitution, a seizure occurs if "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Florida v. Bostick,* 501 U.S. 429, 437, 111 S. Ct. 2382, 2387 (1991) (quoting *Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S. Ct. 1975, 1977 (1988)); *see also United States v. Mendenhall,* 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980) (plurality) (finding the test for seizure is whether "a reasonable person would have believed that he was not free to leave").  Fogg does not argue for a different standard under the Iowa Constitution.

Under the *Bostick–Mendenhall* test, the determination of whether a reasonable person would feel free to leave is "an independent evaluation [based on] the totality of the circumstances as shown by the entire record." *State v. Kurth,* 813 N.W.2d 270, 272 (Iowa 2012) (alteration in original) (quoting *State v. Krogman,* 804 N.W.2d 518, 522 (Iowa 2011)).  The "free to leave" *Bostick–Mendenhall* test is not dependent on the subjective state of mind of the individual approached by police but is an objective standard based on that of a reasonable person.  *See Chesternut,* 486 U.S. at 573–74, 108 S. Ct. at 1979–80.

The *Bostick–Mendenhall* standard has been applied in countless search and seizure cases in state and federal courts.  Disputes in the caselaw are generally about application of the legal standard to the circumstances presented in a given case.  *See County of Grant v. Vogt,* 850 N.W.2d 253, 270 (Wis. 2014) (Ziegler, J., concurring).  Many courts applying the *Bostick–Mendenhall* standard declare the case is "close"

before making the ultimate decision. *See, e.g., People v. Cascio*, 932 P.2d 1381, 1385 (Colo. 1997) (en banc) (noting that the distinction between a consensual encounter and investigatory stop is "sometimes subtle" and presents a "close question"); *State v. Jestice*, 861 A.2d 1060, 1062 (Vt. 2004) (finding a "close question" of seizure with a uniformed officer in a marked police vehicle shining headlights into defendant's car and essentially blocking defendant's exit).

Application of the free-to-leave standard to particular facts by a majority of the United States Supreme Court has generated sharp dissent. By way of example, the Supreme Court's application of the free-to-leave doctrine yielded a controversial result in *INS v. Delgado*, 466 U.S. 210, 104 S. Ct. 1758 (1984). In *Delgado,* INS officers entered two factories and questioned the entire work force looking for illegal workers. *Id.* at 212, 104 S. Ct. at 1760. INS agents were posted at the doors of the exits to the factories and caused "some disruption." *Id.* at 218, 104 S. Ct. at 1763. The workers, however, were free to move around the factory floors. *Id.* The Court found no seizure. *Id.* at 220–21, 104 S. Ct. at 1765.

Justice Brennan, joined by Justice Marshall, dissented. According to Justice Brennan, the majority opinion reflected "a studied air of unreality" and reached its conclusion "only through a considerable feat of legerdemain." *Id.* at 226, 104 S. Ct. at 1767–68 (Brennan, J., dissenting). Although there was no physical restraint on individuals, Justice Brennan emphasized the show of authority represented by a force of fifteen to twenty-five agents systematically sweeping the workforce floor with guards stationed at each exit. *Id.* at 229–30, 104 S. Ct. at 1769–70. According to Justice Brennan, no reasonable person would have felt free to leave or terminate the encounter with the INS officers. *Id.* at 230, 104 S. Ct. at 1770.

Another controversial free-to-leave case is *Drayton,* 536 U.S. 194, 122 S. Ct. 2105, where the Supreme Court considered whether passengers on a bus were seized under the Fourth Amendment. In *Drayton,* three plainclothes officers boarded a bus. *Id.* at 197, 122 S. Ct. at 2109. One officer knelt backwards in the driver's seat at the front of the bus where all passengers could be observed. *Id.* at 197–98, 122 S. Ct. at 2109. A second officer was stationed at the back of the bus, while a third officer moved up and down the bus questioning passengers. *Id.* at 198, 122 S. Ct. at 2109. A 6–3 majority of the Supreme Court held that no seizure occurred under these facts. *Id.* at 208, 122 S. Ct. at 2114. The majority reasoned that a reasonable person would feel free to terminate the encounter with the police. *Id.* at 206–07, 122 S. Ct. at 2113–14. Justice Souter, along with Justices Stevens and Ginsburg, dissented, asserting that the presence of the officers created an "atmosphere of obligatory participation" that no reasonable person would feel free to terminate. *Id.* at 212, 122 S. Ct. at 2116 (Souter, J., dissenting).

A third controversial application of the free-to-leave doctrine by the Supreme Court is *California v. Hodari D.,* 499 U.S. 621, 626, 111 S. Ct. 1547, 1550–51 (1991). In *Hodari D.,* the Court considered whether a defendant was seized. The defendant was standing with other youths in what the Court labeled a high crime area. *Id.* at 622–23, 111 S. Ct. at 1549. When an unmarked police car approached, the youths ran. *Id.* at 623, 111 S. Ct. at 1549. The officers pursued the defendant, and a few seconds before he was tackled, the defendant threw a rock of cocaine. *Id.* A California appellate court had ruled that the encounter became a seizure when the officers ran after the defendant. *In re Hodari D.,* 265 Cal. Rptr. 79, 82–83 (Ct. App. 1989), *rev'd sub nom. Hodari D.,* 499 U.S. 621, 111 S. Ct. 1547.

In the Supreme Court's reversal, the majority found that the seizure did not occur until hands were laid on the suspect. *Hodari D.*, 499 U.S. at 628–29, 111 S. Ct. at 1552. The majority opinion focused on the common law of arrest rather than the *Bostick–Mendenhall* standard. *Id.* Justice Stevens, joined by Justice Marshall, dissented. Justice Stevens emphasized that a seizure occurs when an individual's personal liberty is restrained "*in some way*" and that under the facts and circumstances, a seizure clearly occurred. *Id.* at 637, 111 S. Ct. at 1556 (Stevens, J., dissenting).

The application of the *Bostick–Mendenhall* standard by the Supreme Court in these cases and others has drawn criticism among scholars. According to Professor Wayne LaFave, "the Court finds a perceived freedom to depart in circumstances when only the most thick-skinned of suspects would think such a choice was open to them." Wayne R. LaFave, *Pinguitudinous Police, Pachydermatous Prey: Whence Fourth Amendment Seizures*, 1991 U. Ill. L. Rev. 729, 739–40 (1991).

So too has the free-to-leave standard been criticized by lower courts.

> It is, of course, a convenient legal fiction to suppose that most people would elect to walk away from a police officer who asks to speak with them. Most would probably believe that it is, at least, in their best interests to cooperate, if not their duty. Indeed, walking away, or more precisely flight, can itself be a basis for a seizure.

*State v. Wilt*, No. 19108, 2002 WL 272593, at *4 (Ohio Ct. App. Feb. 22, 2002); *see, e.g.*, *United States v. Schuett*, No. 11-20574-BC, 2012 WL 3109394, at *6 (E.D. Mich. July 31, 2012) ("The 'free to walk away' test is, it must be acknowledged, a legal fiction."); *Hill v. Commonwealth*, 812 S.E.2d 452, 463 (Va. Ct. App. 2018) ("[T]he encounter is not consensual at all and our oft repeated observation that these encounters are by definition consensual because citizens can ignore the officer and just walk away is

as much a legal fiction as most citizens believe it to be."), *aff'd*, 832 S.E.2d 33 (Va. 2019); *Vogt*, 850 N.W.2d at 262 n.14 (majority opinion) ("To some extent, the 'reasonable person' here is a legal fiction. That defendants often consent to searches of areas that reveal incriminating evidence demonstrates that people often do not feel free to decline an officer's request, even absent a manifest show of authority.").

Critics point to social-psychological research, dating to the Milgram 1963 obedience-to-authority study, that demonstrate how reasonable, competent people comply with authority figures despite such compliance cutting against their interest or judgment. *See, e.g.*, Janice Nadler, *No Need to Shout: Bus Sweeps and the Psychology of Coercion*, 2002 Sup. Ct. Rev. 153, 175–77 (2002) (comparing and contrasting the Milgram experiment with the fact pattern of *Drayton*); Ric Simmons, *Not "Voluntary" but Still Reasonable: A New Paradigm for Understanding the Consent Searches Doctrine*, 80 Ind. L.J. 773, 815, 817–18 (2005) [hereinafter Simmons] (citing to studies finding civilians largely consent to all search requests and criticizing the focus of the free-to-leave doctrine on civilian rather than officer conduct, as well as finding little consideration of the myriad reasons a reasonable person may feel unable to decline); Daniel J. Steinbock, *The Wrong Line Between Freedom and Restraint: The Unreality, Obscurity, and Incivility of the Fourth Amendment Consensual Encounter Doctrine*, 38 San Diego L. Rev. 507, 525–57 (2001) (exploring existing caselaw to determine attributes of a reasonable person); Marcy Strauss, *Reconstructing Consent*, 92 J. Crim. L. & Criminology 211, 236, 239–44 (2001) [hereinafter Strauss] (exploring existing data and finding a number of factors that may induce compliance with a request or demand from an officer, particularly in communities of color).

Two recent empirical studies support the common sense observation that most reasonable people do not feel free to leave when approached by police in a variety of circumstances. For example, a recent study was conducted to determine when people feel free to leave in situations involving interactions with police on public sidewalks and in buses. *See* David K. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J. Crim. L. & Criminology 51, 51–52 (2008) [hereinafter Kessler]. The results of the study suggested that

> [most] people walking on the sidewalk or riding on a bus would not feel free to leave when approached by a police officer and asked questions. . . . Even people who knew they had the right to leave or not talk to the police officer still did not feel free to leave.

*Id.* at 87.

The second study, examining how people react to security officers, revealed that none of the eighty-three people studied questioned the authority of the security officers. Alisa M. Smith et al., *Testing Judicial Assumptions of the "Consensual" Encounter: An Experimental Study*, 14 Fla. Coastal L. Rev. 285, 291 (2013) [hereinafter Smith]. The authors conclude that the research "contradicts the judicial assumption that reasonable people feel free to ignore officers, decline their requests, and terminate encounters with them, or alternatively that they are not merely submitting to the authority of the police during these encounters." *Id.* at 318; *see also* Edwin J. Butterfoss, *Bright Line Seizures: The Need for Clarity in Determining When Fourth Amendment Activity Begins*, 79 J. Crim. L. & Criminology 437, 439–42 (1988) (criticizing the free-to-leave doctrine, and finding that actual application should result in virtually all police–citizen encounters being seizures).

In this case, Fogg claims that the unwarranted seizure in this case was unlawful under both article I, section 8 of the Iowa Constitution and the Fourth Amendment of the United States Constitution. Fogg does not suggest, however, that we should apply a standard other than that established by the United States Supreme Court under *Bostick–Mendenhall.* When a party raises the Iowa Constitution but does not suggest a standard different than the federal precedent, we may apply the standard more stringently than the federal caselaw. *See State v. Oliver*, 812 N.W.2d 636, 649–50 (Iowa 2012) (applying more stringent gross disproportionality review under the Iowa Constitution than the Federal Constitution); *Pals*, 805 N.W.2d at 771–72 ("Even where a party has not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal caselaw."); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009) (finding that even when applying the general principles of the United States Supreme Court, federal standards may be differently applied under Iowa Supreme Court review). *See generally* Cynthia Lee, *Reasonableness with Teeth: The Future of Fourth Amendment Reasonableness Analysis*, 81 Miss. L.J. 1133 (2012) (discussing the current framework utilized by the United States Supreme Court and urging more stringent review of reasonableness by courts).

4. *Iowa caselaw on seizure of blocked vehicles.* We have had two cases that have considered application of search and seizure principles involving parked vehicles: *Harlan*, 301 N.W.2d 717, and *Wilkes*, 756 N.W.2d 838. Both cases involved efforts to suppress evidence arising from warrantless seizures under the Fourth Amendment.

In *Harlan*, we considered a challenge to a vehicle search of a driver of a parked vehicle in the early morning hours. 301 N.W.2d at 718–19.

After following the defendant, the officer in *Harlan* pulled his cruiser over and approached the driver of the vehicle. *Id.* at 719. When the officer shined his flashlight into the vehicle, he saw that the driver's eyes were watery and bloodshot. He also smelled alcohol emanating from the defendant. *Id.* The officer asked the defendant to perform field sobriety tests and ultimately arrested the defendant for OWI. *Id.*

We held in *Harlan* that there was no seizure prior to the officer obtaining reasonable suspicion to believe that the driver was driving his vehicle while intoxicated. *Id.* at 720. We emphasized that the record showed no threat of physical force, no use of compelling language, no use of sirens, and no forced stop. *Id.*

In the second case, *Wilkes*, a uniformed officer shined headlights on a truck parked in a quarry around midnight. 756 N.W.2d at 840, 844. The officer pulled his vehicle to a distance of ten or fifteen feet behind the truck. *Id.* at 840–41. The officer's vehicle did not block the entrance to the quarry in any way. *Id.* When the officer approached the defendant's vehicle, he smelled a strong odor of alcohol emanating from the defendant. *Id.* at 841. After field sobriety and a preliminary breath test were administered, Wilkes was arrested for OWI. *Id.* The district court and the court of appeals concluded that an unlawful seizure had occurred and suppressed the evidence obtained as a result of the seizure. *Id.*

We held in *Wilkes* that no seizure occurred under the facts of the case. *Id.* at 844. We emphasized that while the police vehicle was parked behind the vehicle driven by the defendant, "the ability of [the defendant] to drive away was not substantially impaired." *Id.* Indeed, we noted that the defendant himself testified at the hearing that there were "at least two ways for him to turn his truck around and leave the quarry, had he chosen to do so." *Id.*

5. *State and federal caselaw.* Although each case turns on its unique facts, we have surveyed state and federal caselaw for guidance on what constitutes a seizure in the context of police parking their automobiles and approaching other automobiles. While "the officer's conduct is the primary focus," other factors such as "time, place, and attendant circumstances" have a bearing on the court's analysis as well. *State v. Garcia-Cantu*, 253 S.W.3d 236, 244 (Tex. Crim. App. 2008).

In general, however, the cases suggest that where the facts demonstrate a police vehicle blocks another vehicle from egress, a seizure ordinarily occurs. *See United States v. See*, 574 F.3d 309, 311 (6th Cir. 2009) (holding that "the blocking of [the defendant's car with a marked patrol car] to determine the identity of the occupants and maintain the status quo while obtaining this information was a warrantless *Terry* seizure. . . . [A] reasonable person in [the defendant's] position would not have felt free to leave."); *United States v. Kerr*, 817 F.2d 1384, 1386–87 (9th Cir. 1987) (finding that when a uniformed officer approached a car after blocking the one-lane driveway as defendant was backing out, a seizure occurred, leaving defendant with "no reasonable alternative except an encounter with the police"); *State v. Rosario*, 162 A.3d 249, 255 (N.J. 2017) ("A person sitting in a lawfully parked car outside her home who suddenly finds herself blocked in by a patrol car that shines a flood light into the vehicle, only to have the officer exit his marked car and approach the driver's side of the vehicle, would not reasonably feel free to leave."); *People v. Jennings*, 385 N.E.2d 1045, 1045–46 (N.Y. 1978) (holding that where police park perpendicular to car in parking lot, thereby blocking vehicle, seizure occurs); *Jestice*, 861 A.2d at 1062–63 (finding a seizure occurred where a uniformed officer parked police vehicle with headlights on nose to nose with defendant's car, even though there was still room to

maneuver cars). As aptly stated by Professor Wayne LaFave, "boxing the car in," among other things, "will likely convert the event into a Fourth Amendment seizure." 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.4(a), at 596–99 (5th ed. 2012).

The cases finding a seizure arising from the blocking of the defendant's vehicle by a police vehicle do not require complete closure of all theoretical routes of egress. Instead, it is sufficient if the police vehicle substantially limits maneuverability of the defendant's vehicle. *See Johnson v. State*, 414 S.W.3d 184, 193 (Tex. Crim. App. 2013) (finding seizure certainly occurred when officer shone lights into and blocked appellant's car such that appellant would have had to "maneuver" his car from its parking place if he wished to terminate the interaction); *Jestice*, 861 A.2d at 1062–63 (holding seizure occurs even though police cruiser did not completely block defendant's vehicle, but that defendant would have had to back up and maneuver to avoid the officer). To find otherwise inappropriately sterilizes the search and seizure protections and

> would undermine "the right of the people to be secure in their persons, houses, papers and effects," and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law.

*Johnson*, 333 U.S. at 17, 68 S. Ct. at 370–71 (quoting U.S. Const. amend. IV).

Further, the cases finding a seizure arising from the blocking of a defendant's vehicle by a police car do not require that the vehicle actually come to a stop as a result of police action but only that the person in the vehicle reasonably believe that he or she is not free to leave. *See People v. Guy*, 329 N.W.2d 435, 440 (Mich. Ct. App. 1982) ("Although the initial stop of the [defendant's vehicle] in the driveway was not a result of [the officer's]

actions, [the officer's] partial blockage of the driveway and subsequent visit to the [vehicle] clearly constituted a detention of the automobile and would be the equivalent of a police initiated 'stop.' "); *Rosario*, 162 A.3d at 255 ("The difference between a field inquiry and an investigative detention always comes down to whether an objectively reasonable person would have felt free to leave or to terminate the encounter with police. The encounter is measured from a defendant's perspective."); *Thomas v. State*, 633 S.W.2d 334, 335 (Tex. App. 1982) ("Thus, when a person is sitting in a parked car and a police officer orders him to roll down the window or to open the door, there is at that point a temporary seizure."); *State v. Smith*, 781 P.2d 879, 881 (Utah Ct. App. 1989) (stating question is whether reasonable individual would believe they were not free to leave), *disapproved of on other grounds by State v. Lopez*, 873 P.2d 1127, 1134–35, 1135 n.3 (Utah 1994); *State v. Burgess*, 657 A.2d 202, 203 (Vt. 1995) ("Courts have long held that a show of authority tending to inhibit a suspect's departure from the scene is sufficient to constitute a stop, even though the vehicle is already stopped at the time of an approach by police."). These cases are consistent with the approach of the United States Supreme Court in *Adams v. Williams*, 407 U.S. 143, 144–45, 149, 92 S. Ct. 1921, 1922–23, 1925 (1972), where implicit in the Supreme Court's opinion is the notion that a suspect who is already stationary does not preclude the finding of seizure.

On the other hand, when a police vehicle merely parks beside or behind a vehicle, or where the egress is only slightly restricted, a seizure does not occur. *See United States v. Carr*, 674 F.3d 570, 573 (6th Cir. 2012) (finding no seizure occurred when the position of the police vehicle left ample room for defendant to maneuver around the police vehicle); *United States v. Ringold*, 335 F.3d 1168, 1173 (10th Cir. 2003) (finding no

seizure occurred when the position of the police vehicle does not impede defendant's egress); *Cascio*, 932 P.2d at 1386–87 (noting where egress is "only slightly restricted" by police vehicle, no seizure occurs); *People v. Black*, 872 N.Y.S.2d 791, 793 (App. Div. 2009) (finding no seizure occurred when defendant's car was already stopped and police "did not park their patrol vehicle in such a manner as to block the driveway in which the vehicle was parked"). Generally, there must be additional facts and circumstances to support a seizure, such as the glare of a spotlight or other affirmative acts to generate a reasonable belief that the individual is not free to leave. *See Burgess*, 657 A.2d at 203 (holding that a seizure occurred when the officer pulled up behind defendant's vehicle and activated flashing blue police lights).

6. *Discussion.* Based on my review of the entire record, I conclude that Fogg was seized in violation of article I, section 8 of the Iowa Constitution.

> Surely it is clear beyond peradventure that the Iowa founders were devoted to civil liberties. Iowa's state motto—"Our liberties we prize and our rights we will maintain"—is not just a slogan but reflects a libertarian spirit rather than state authoritarianism.

*State v. Brown*, 930 N.W.2d 840, 882 (Iowa 2019) (Appel, J., dissenting). The clear trend in the caselaw is to find a seizure when a police officer substantially blocks a vehicle from leaving the scene, even if already parked. Here, there is no question that Officer Frazier's squad car substantially impaired the ability of Fogg to leave the scene. The fact that Fogg could have conceivably escaped is not determinative. *See Johnson*, 414 S.W.3d at 193; *Jestice*, 861 A.2d at 1062–63.

In addition, the totality of the circumstances here suggest a seizure occurred. The headlights of the police cruiser shined head on, directly into

Fogg's windshield. Officer Frazier approached the vehicle in full uniform. Fogg was parked in a residential alley at 10:00 p.m. Under these circumstances, we are confident that no reasonable person would feel free to simply ignore the officer and leave the scene. Common sense, social-psychological research, and empirical studies combine to strongly suggest that reasonable people generally do not believe they can simply disregard an approaching, uniformed police officer, and certainly would not feel free to leave under the circumstances of this case. *See generally* Kessler, 99 J. Crim. L. & Criminology at 87; Simmons, 80 Ind. L.J. at 817–18; Smith, 14 Fla. Coastal L. Rev. 285 at 318; Strauss, 92 J. Crim. L. & Criminology at 239–44.

It would be sheer poppycock to suggest that a reasonable person in the circumstances of the case at hand would have felt free to avoid the police vehicle blocking the alleyway while a uniformed officer approached. Indeed, as Professor James Adams has noted,

> Citizens are caught in a "Catch 22." Exercise of citizen rights in the face of police rights may cause police to escalate the intrusiveness of the encounter and place the citizen at risk of both physical harm and formal arrest. Failure to exercise citizen rights by responding to the officer, however, may be viewed as consensual conduct removing the encounter from Fourth Amendment analysis.

James A. Adams, *Search and Seizure as Seen by Supreme Court Justices: Are They Serious or Is This Just Judicial Humor*, 12 St. Louis U. Pub. L. Rev. 413, 441 (1993). A reasonable person in Fogg's shoes would have reason to fear the consequences of a mad dash to escape, which could end in the application of force or potential criminal charges.

A central pillar of our legal system is truth telling. A legal system that trumpets robust protection to individuals based on their reasonable belief and then applies the principle out of existence risks losing public

trust. It is hard to see how anyone could seriously believe that under the circumstances presented here, a reasonable person would feel free to bob, dodge, and evade Officer Frazier. Would a reasonable person, faced with a marked patrol car blocking forward progress and shining headlights in her face, attempt to back 125 feet down a dark, narrow alleyway as a uniformed officer marched toward her? Would a reasonable person attempt a three-point turn, on darkened private property no less, or alternatively, drive in a darkened, grassy, unfamiliar ditch under these circumstances? And is the expectation that Officer Frazier would help direct her as she drove over the neighbor's grass, or private property, and then toss a friendly wave and neighborly smile as she drove away? Really?

Perhaps Justice Jackson said it best when he stated that Fourth Amendment protections are

> not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

*Brinegar v. United States*, 338 U.S. 160, 180–81, 69 S. Ct. 1302, 1313 (1949) (Jackson, J., dissenting). We have consistently held, both nationally and in Iowa, that constitutional protections against undue police action are the bulwark against totalitarian state action. Indeed,

> [t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in "the concept of ordered liberty" and as such enforceable against the States through the Due Process Clause.

*Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S. Ct. 1359, 1361 (1949), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643, 654, 81 S. Ct. 1684, 1691 (1961).

For all the above reasons, I conclude that the district court and today's majority should have found that a seizure occurred in this case under both the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution.

**C. Unbriefed Issues of Reasonable Suspicion and Community Caretaking.** Although the State below urged the district court to deny the motion to suppress based on reasonable suspicion that a crime was afoot or upon the community caretaking exception to the warrant requirement, the State has not briefed these issues in its appeal. When the State does not raise an argument on appeal, we have found waiver. *State v. Dudley*, 856 N.W.2d 668, 678–79 (Iowa 2014) (finding that the state waived their harmless-error argument by failing to raise it on appeal); *Short*, 851 N.W.2d at 479 (holding that the state waived arguments regarding allegedly defective warrant or exigent circumstances on appeal due to failure to raise argument); *In re Det. of Blaise*, 830 N.W.2d 310, 319–21, 319 n.5 (Iowa 2013) (stating that the state waives their harmless-error argument by failing to raise on appeal, but noting exception where defendant claims ineffective assistance of counsel and has burden of showing prejudice). When the state has declined to raise directly, or by implication, alternate issues on appeal, reaching the merits of totally unbriefed claims would require us to assume a partisan role in this litigation. And we have always held that we will not decide or consider issues raised for the first time during oral argument. *See Inghram v. Dairyland Mut. Ins.*, 215 N.W.2d 239, 240 (Iowa 1974) (en banc) ("To reach the merits of this case would require us to assume a partisan role and

undertake the appellant's research and advocacy. This role is one we refuse to assume.").[2]

## IV. Conclusion.

For the above reasons, the majority should have vacated the court of appeals ruling, reversed the ruling of the district court denying the motion to suppress evidence, and ordered the matter remanded to the district court. Accordingly, I respectfully dissent.

Wiggins, C.J., joins this dissent.

---

[2]In *King v. State*, 818 N.W.2d 1 (Iowa 2012), the majority of this court considered issues not raised by the appellee in an interlocutory appeal. In that case, the parties extensively briefed the issues not raised in the interlocutory appeal before the district court, and the extensive trial court briefing was made part of the appellate record. Additionally, the plaintiffs did not object to consideration of the larger issues as part of the interlocutory appeal, and the issue before the court was interrelated with the issues not briefed on appeal. *Id.* at 11–12. Here, the appeal is not interlocutory, the briefing before the trial court was conclusory at best, and the opposing party has not consented to the consideration of the unbriefed issues.